NO. 4-06-0778     Filed 6/21/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: the Estate of KENNETH STARK, | ) | Appeal from |
| Deceased, | ) | Circuit Court of |
| SOUTHERN ILLINOIS UNIVERSITY FOUNDATION | ) | Pike County |
| and SHRINERS HOSPITAL FOR CHILDREN, | ) | No. 04P32 |
| Petitioners and Legatees Under the Last | ) | |
| Will of KENNETH STARK; and EVELYN | ) | |
| KRUEGER, Executrix, | ) | |
| Petitioners-Appellants, | ) | |
| v. | ) | |
| VESTA STARK, By and Through MARK A. | ) | |
| REYNOLDS, Her Agent Under a Durable | ) | Honorable |
| Power of Attorney, | ) | Michael R. Roseberry, |
| Respondent-Appellee. | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

Copetitioner-beneficiaries, Southern Illinois University Foundation (SIU) and Shriners Hospital for Children (Shriners), filed a motion to vacate the renunciation of Kenneth Stark's will.  The renunciation had been filed by respondent, Kenneth's legally incompetent wife Vesta Stark, by and through her agent, Mark Reynolds, under the Illinois Power of Attorney Act (Power of Attorney Act) (755 ILCS 45/1-1 through 4-12 (West 2004)).  The petition to vacate the renunciation alleged that (1) the renunciation was not valid because Vesta was incompetent at the time she signed the power of attorney; and (2) the renunciation was not valid because Mark was not acting "for the benefit of the principal," as defined under the Power of Attorney Act, when he filed the renunciation (755 ILCS 45/2-7, 2-10 (West

2004)).  Both parties filed motions for summary judgment on the issue of whether Mark acted for the benefit of the principal. The trial court denied petitioners' motion for summary judgment and granted summary judgment in favor of respondent (Mark).  The trial court entered an order under Supreme Court Rule 304(a), finding no just reason for delaying enforcement or appeal of the judgment.  210 Ill. 2d R. 304(a).  Petitioners appealed.  We dismiss the appeal for lack of appellate jurisdiction under Rule 304(a).

## I. BACKGROUND

Kenneth and Vesta Stark were married for 15 years prior to Kenneth's death in 2004, at age 97.  This was Kenneth's only marriage, and Kenneth had no descendants.  Vesta, who is currently around 87 years old, had been married once before and had two sons, Mark Reynolds, her agent under power of attorney, and James Reynolds.  Kenneth had been very generous to Mark and James.  In 1983, Kenneth loaned Mark and James substantial amounts of money, which they would not otherwise have been able to secure, in order for them each to move to Illinois and acquire a bank.  Mark and James were in their thirties at that time. Fifteen years later, James sold his bank and retired on the proceeds, which were in excess of $1 million.  Mark currently has an 80% interest in a bank with a fair market value of $3.2 million.

In 1991, Vesta executed a will leaving everything to Mark and James. In 1998, Vesta began to experience the early stages of Alzheimer's disease. Vesta received treatment from copetitioner SIU at the School of Medicine. On March 29, 2002, Vesta signed a durable power of attorney with Mark as her agent. The power of attorney signed by Vesta authorized Mark to perform real estate transactions, including renouncing any property interest. 755 ILCS 45/3-4(n) (West 2002). From the time Vesta signed the power of attorney forward, Vesta received 24-hour care for her Alzheimer's.

On June 14, 2004, Kenneth Stark signed a will that bequeathed $100,000 to Illinois College of Jacksonville, Illinois, and $100,000 to Kenneth's brother, Lyndle Stark. The will named copetitioner Evelyn Krueger, Kenneth's sister, as executrix. The will bequeathed the rest, residue, and remainder equally to SIU and Shriners. The rest, residue, and remainder was in excess of $4,600,000. The gift to SIU was to be used by the Department of Neurology for Alzheimer's research. The will did not make any bequest to Vesta. Instead, the will stated:

> "My wife's name is Vesta Stark, and she is
> herein referred to as 'my spouse.' I have
> made adequate and suitable provisions for my
> beloved spouse from my resources outside the
> provision of my Last Will."

Indeed, it was later disclosed that Vesta, who had been a school teacher and not born into wealth, had assets valued in the neighborhood of $1.5 million. Additionally, Kenneth had gifted land to the University of Illinois that would pay a 9% return for the term of Vesta's life, or approximately $180,000 annually. Vesta's income exceeded her expenses by more than $100,000 per year.

On June 26, 2004, Kenneth passed away. On June 29, 2004, the will was filed with the courts and, on June 30, 2004, the will was admitted to probate. On October 5, 2004, Mark, acting as Vesta's agent under the power of attorney, filed a renunciation of Kenneth's will. See 755 ILCS 5/2-8 (West 2004) (a surviving spouse may renounce a will whether or not the will contains any provision for the surviving spouse). That same day, Vesta also filed a renunciation, purportedly on her own behalf, but Mark later admitted that this renunciation was invalid as Vesta was clearly incompetent by that time. Vesta would receive nothing under the will as filed; however, if the will were renounced, Vesta would receive her statutory one-half share worth in excess of $2.3 million.

On October 18, 2004, Mark and James filed a petition for the adjudication of disability and for the appointment of a guardian for Vesta. On November 1, 2004, Mark and James moved to dismiss their own petition, stating that the appointment of a

guardian would be unnecessary as Mark already had authority under the power of attorney. The trial court dismissed the petition for guardianship. Nevertheless, we take this opportunity to discuss Vesta's legal competence.

Mark attached a doctor's report to the October 2004 petition for the adjudication of disability. The doctor's report, signed by Dr. James A. Grote, stated that "[Vesta] is an unfortunate lady who *** has been suffering from dementia and Alzheimer's *** which was initially diagnosed and evaluated extensively in 1998 ***. [Vesta], at this point [October 2004], requires prompting and/or assistance with all activities of daily living. [Vesta] has no capabilities for initiating self care or adaptive behavior. [Vesta's] level of status is that she can walk *** unsteadily when prompted and led. She requires assistance with eating, dressing, toileting, [et cetera]. She will eat with prompting and some assistance." As such, no one disputes that Vesta was incompetent as of October 2004.

The depositions of Mark, James, and copetitioner Evelyn Krueger present conflicting evidence as to exactly when Vesta became incompetent. Everyone agrees that Kenneth, Vesta, and Evelyn spent November 2001 to February 2002 in Kenneth's winter home in Naples, Florida. Mark and James each made separate visits down to Naples during that time.

Evelyn testified that, based on her experience with

Vesta in Naples, Vesta would "absolutely not" be capable of understanding the power of attorney that Vesta signed in March 2002. Kenneth had asked Evelyn to come to Naples to help him keep an eye on Vesta. Evelyn testified that she and Kenneth had to put new locks on the doors because they were worried about Vesta getting outside. Evelyn once caught Vesta trying to go outside, and Vesta said that she wanted to see her mother, even though her mother had been dead for years. Evelyn testified that during this time Vesta would often mistake Kenneth for her grandfather, father, brother, or son.

On March 24, 2002, five days before Vesta ultimately signed the power of attorney, Vesta was admitted to the hospital following a fall. Kenneth was already in the hospital, recovering from a stroke (apparently Kenneth recovered to the point where he could supervise Vesta, until he died in 2004). The medical report from Vesta's March 24, 2002, admission into the hospital was alluded to in both Mark's and James' depositions but is otherwise absent from the record. The medical report stated that Vesta "had been demented for some time" as of March 24, 2002. The report stated that Vesta's verbal responses were slow and that her answers were obtuse and not consistent with the questions. Additionally, during her stay at the hospital, Vesta became confused and started cleaning the hospital bathroom. Vesta thought that she was at home and that it was her own

bathroom.  Mark and James did not dispute the statement that Vesta "had been demented for some time."  It was not their experience, however, that Vesta answered questions inappropriately.  They were also surprised by the bathroom incident.  Mark stated that it was during this hospital stay that a doctor asked Mark if Mark had a power of attorney for Vesta.  Mark did not but thought it was a good idea and promptly had a family attorney, John McMillan, draw up the papers.

Five days later, back at her home, Mark had Vesta sign the power of attorney.  There is a fair amount of uncertainty as to who else was present.  However, it seems safe to say that Mark, James, Mark's son, and McMillan were present.  Kenneth and Mark's wife, Jane, were also most likely present.  Mark and James asked Vesta if she wanted them to be the ones to look after her after Kenneth was no longer able to do so, and Vesta said yes.  Mark explained the basic premise of the power of attorney before Vesta signed it.  Mark admits that Vesta did not read the power of attorney before she signed it.  However, Mark felt fairly certain that Vesta understood that the power of attorney allowed Mark to do "basically anything" on Vesta's behalf that Vesta could no longer do for herself.  According to Mark, while Vesta might not have understood the minute details of the power of attorney, she understood the general concept that Mark would be able to look after her financial affairs.  Mark never acted under

power of attorney until after Kenneth died.

On December 23, 2004, Shriners and SIU filed a motion to vacate the renunciation of the will. First, Shriners and SIU alleged that Mark's power of attorney was invalid, and therefore so was the renunciation, because Vesta was incompetent when she executed the power of attorney in March 2002. Second, Shriners and SIU alleged that the renunciation was not "for the benefit" of the principal under section 2-7 (755 ILCS 45/2-7 (West 2004)) of the Power of Attorney Act.

On April 19, 2005, Mark moved for a protective order on behalf of Vesta, requesting that any inquiries concerning Vesta's assets, income, and expenses be prohibited. The motion cited sections 2-7 and 2-10 of the Power of Attorney Act, which require an agent to act for the benefit of the principal, and claimed that the financial circumstances of Vesta were not relevant to whether the renunciation was made for Vesta's benefit. On June 20, 2005, after a hearing on the motion, the trial court ordered Vesta to disclose her financial circumstances.

That same day, Mark filed a motion for partial summary judgment on the issue of whether Mark acted "for the benefit of the principal" in renouncing the will. Mark concluded his motion for summary judgment by arguing that "the result of the action taken by the agent is that Vesta Stark will inherit one-half the Estate of Kenneth Stark as opposed to nothing."

On August 5, 2005, before Vesta had fully disclosed her financial circumstances as ordered, the trial court denied Mark's motion for summary judgment.

On October 28, 2005, Mark disclosed Vesta's financial information. Vesta's estate was worth more than $1.5 million. Vesta's total income in the 15 months since Kenneth's death, based on interest from investments, social security, and other annuities, exceeded $350,000. Vesta's total expenditures in the 15 months since Kenneth's death, including the cost of 24-hour health care and supervision, did not exceed $192,000. Vesta, through Mark, had recently gifted $182,500 to Mark and James, their spouses, and their children.

On November 3, 2005, petitioners Shriners and SIU filed a motion for summary judgment, which was later joined by copetitioner Evelyn Krueger. Petitioners argued that in light of Vesta's substantial assets provided by Kenneth outside the resources of the will, Mark did not act "for the benefit of" Vesta in renouncing the will. On January 16, 2006, Mark filed a cross-motion for summary judgment.

In February 2006, the trial court denied petitioners' motion for summary judgment. In denying petitioners' motion, the court noted in a written order that petitioners had not met their burden of showing that the action of Mark as the agent under power of attorney was not for the benefit of Vesta.

The trial court granted Mark's motion for summary judgment based on (1) the assumption that the power of attorney was valid, (2) the fact that the power of attorney signed by Vesta did not limit Mark's authority to renounce the will, and (3) the petitioners' failure to show that Mark was not acting for the benefit of Vesta in renouncing the will.

The trial court entered an order under Rule 304(a), finding no just reason for delaying the enforcement or appeal of either the court's grant of Mark's summary judgment or denial of petitioners' summary judgment. 210 Ill. 2d R. 304(a). The issue of whether Vesta was competent when she executed the power of attorney was reserved for further proceedings before the trial court.

The trial court also entered a statement pursuant to Rule 308(a) (155 Ill. 2d R. 308(a)), identifying the question of law presented by its order as follows:

> "Whether the financial status of the principal is relevant or material to a [c]ourt's review of the acts of an agent under an Illinois Statutory Power of Attorney for [p]roperty, who renounces the [w]ill of the principal's deceased spouse, pursuant to such authorization in the Power of Attorney, and the principal will receive a larger share

of the estate of her deceased husband as a

result of the renunciation."

Though not evident from the record, petitioners state in their brief that the Rule 308 appeal was dismissed. This appeal followed.

## II. ANALYSIS

The question before this court on a Rule 304(a) appeal is twofold. First, did the trial court err in <u>denying</u> petitioner's summary judgment on the issue of whether Mark was "not acting for the benefit of" Vesta in renouncing the will? Second, did the court err in <u>granting</u> summary judgment to Mark on that same issue? Each of these matters speaks to the question of what constitutes "not acting for the benefit of" under sections 2-7 and 2-10 of the Power of Attorney Act, which is a matter of first impression for Illinois courts.

Section 2-7 states that whenever an agent acts under power of attorney, the agent must use due care to act "for the benefit of the principal" in accordance with the terms of the agency and shall be liable for negligent exercise. 755 ILCS 45/2-7 (West 2004). Section 2-10 states that, upon petition by any interested person and a finding by the court that the principal lacks the capacity to control or revoke the agency, "if the court finds that the agent is not acting for the benefit of the principal in accordance with the terms of the agency or that

the agent's action or inaction has caused or threatens [to cause] substantial harm to the principal's person or property in a manner not authorized or intended by the principal, the court may order a guardian of the principal's person or estate to exercise any powers of the principal under the agency, *** or may enter such other orders without appointment of a guardian as the court deems necessary to provide for the best interests of the principal."  755 ILCS 45/2-10 (West 2004).

However, we decline to reach the issue on the merits. As is our duty, we raise the issue of appellate jurisdiction under Rule 304(a) sua sponte.  See Geier v. Hamer Enterprises, Inc., 226 Ill. App. 3d 372, 375, 589 N.E.2d 711, 713 (1992). Rule 304(a) provides that if multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the claims if the trial court has made an explicit written finding that no just reason exists for delaying either enforcement or appeal.  210 Ill. 2d R. 304(a).  Rule 304(a) does not allow for a trial court to confer appellate jurisdiction merely by using the Rule 304(a) language that "there is no just reason for delaying enforcement or appeal."  Grove v. Carle Foundation Hospital, 364 Ill. App. 3d 412, 416, 846 N.E.2d 153, 157 (2006), citing Rice v. Burnley, 230 Ill. App. 3d 987, 991, 596 N.E.2d 105, 107 (1992).

Illinois courts have looked to federal case law regarding

Rule 54(b) of the Federal Rules of Civil Procedure (28 Fed. R. Civ. P. 54(b)), which is substantially similar to Rule 304(a) in determining appellate jurisdiction. Geier, 226 Ill. App. 3d at 378, 589 N.E.2d at 715 (Rule 304(a)'s policy and language is patterned after Rule 54(b)). Courts apply a two-step process for determining whether appellate jurisdiction lies under Rule 54(b) or Rule 304(a): first, the court makes a determination as to whether the order at issue is "final"; second, the court must determine whether there is any just reason for delaying the appeal. Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 7-8, 64 L. Ed. 2d 1, 11, 100 S. Ct. 1460, 1464-65 (1980); Geier, 226 Ill. App. 3d at 379, 589 N.E.2d at 715.

For a judgment to be "final," it must provide for the ultimate disposition of an individual claim entered in the course of an action involving multiple claims. Geier, 226 Ill. App. 3d at 379, 589 N.E.2d at 716. As under Rule 54(b) case law, the definition of what constitutes an individual "claim" under Rule 304(a) is a somewhat amorphous concept. See General Acquisition, Inc. v. GenCorp Inc., 23 F.3d 1022, 1028 (6th Cir. 1994) (there is no "'generally acceptable test'" as to what constitutes an individual claim). Illinois negligence cases have held that stating a single claim, by way of multiple subparagraphs, does not warrant separate appeal upon dismissal of less than all of the subparagraphs. Hull v. City of Chicago, 165 Ill. App. 3d

- 13 -

732, 733, 520 N.E.2d 720, 721 (1987); see also <u>Rice</u>, 230 Ill. App. 3d at 991, 596 N.E.2d at 107; <u>Brown v. K.J.S. Co.</u>, 189 Ill. App. 3d 768, 770, 545 N.E.2d 555, 556 (1989). In <u>Rice</u> and <u>Hull</u>, the court reasoned that, though the dismissed and remaining counts each dealt with separate acts and omissions, all the counts advanced the same theory of recovery, <u>i.e.</u>, negligence. <u>Rice</u>, 230 Ill. App. 3d at 992, 596 N.E.2d at 108; <u>Hull</u>, 165 Ill. App. 3d at 733, 520 N.E.2d at 721. The <u>Rice</u> and <u>Hull</u> courts held that where each count advanced the same theory of recovery, the separate counts were not separate claims. <u>Rice</u>, 230 Ill. App. 3d at 992, 596 N.E.2d at 108; <u>Hull</u>, 165 Ill. App. 3d at 733, 520 N.E.2d at 721.

Other courts, however, have held that whether there are separate, individual claims for purposes of finding a final order is in some sense a matter of discretion for the trial court. See <u>Olympia Hotels Corp. v. Johnson Wax Development Corp.</u>, 908 F.2d 1363, 1367 (7th Cir. 1990) (stating that the <u>res judicata</u> status of two claims is not conclusive under Rule 54(b)); see also <u>River Park, Inc. v. City of Highland Park</u>, 184 Ill. 2d 290, 311, 703 N.E.2d 883, 893 (1998) (separate claims under Rule 304(a) may still be considered the same cause of action for the purposes of <u>res judicata</u>). In noting that the trial court should exercise its discretion in determining whether a claim is separate for the purposes of finding a final and appealable judgment, the <u>Olympia</u>

Hotels court went on to cite Curtiss-Wright, stating that it is appropriate for the trial judge "to consider such factors as... 'whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once.'" Olympia Hotels, 908 F.2d at 1367-68, quoting Curtiss-Wright, 446 U.S. at 8, 64 L. Ed. 2d at 11, 100 S. Ct. at 1465. Likewise, a trial court may abuse its discretion where a Rule 304(a) order forces the appellate court to decide matters that may never need to be decided. Fleetwood Development Corp. v. Northbrook Property & Casualty Insurance Co., 172 Ill. App. 3d 83, 85-86, 526 N.E.2d 381, 383-84 (1988) (Rule 304(a) order inappropriate as to a third-party claim where the third-party complaint was conditioned on the primary complaint, which had not yet been decided). These discretionary guidelines lead us to the second prong in Curtiss-Wright, i.e., whether there is any just reason for delaying the appeal.

In determining whether there is any just reason for delaying the appeal, the courts consider the following factors:

> "'(1) the relationship between the adjudicated
> and unadjudicated claims; (2) the possibility
> that the need for review might or might not
> be mooted by future developments in the dis-
> trict court; (3) the possibility that the re-
> viewing court might be obliged to consider

the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; [and] (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.'" Geier, 226 Ill. App. 3d at 383, 589 N.E.2d at 718, quoting Allis-Chalmers Corp. v. Philadelphia Electric Co., 521 F.2d 360, 364 (3d Cir. 1975).

Depending on the facts of the case at hand, some or all of these factors may come into play. Geier, 226 Ill. App. 3d at 383, 589 N.E.2d at 718 (ultimately applying federal factors to Rule 304(a) appeals).

The first two factors enumerated above are especially relevant to the instant case. Here, each count in petitioners' motion to revoke seeks remedy against Mark for the depletion of $2.3 million from the assets of the residuary under the single theory that Mark's renunciation on behalf of Vesta was invalid. The first allegation, still pending before the trial court, states that Mark did not have the authority to renounce the will because the power of attorney was not valid. The second allegation, decided by the trial court on a motion for summary

judgment in favor of Mark, states that Mark exceeded the scope of his authority under power of attorney because the renunciation was not for the benefit of Vesta. In part, the legitimacy of the Rule 304(a) appeal before this court is conditioned on the outcome of the claim that remains before the trial court. See Fleetwood, 172 Ill. App. 3d at 85-86, 526 N.E.2d at 383-84. Given the evidence available to this court of Vesta's incompetence during the time she signed the power of attorney, it is at least possible that the court below will find that the power of attorney was never valid to begin with. Were the power of attorney to be held invalid, the question of whether a renunciation would have been for the benefit of Vesta would be moot, making a resolution on the merits of this instant appeal purely advisory. Advisory opinions are to be avoided. People v. Campa, 217 Ill. 2d 243, 269, 840 N.E.2d 1157, 1173 (2005). A decision is advisory if "it cannot result in appropriate relief to the prevailing party." Campa, 217 Ill. 2d at 270, 840 N.E.2d at 1173. Here, given that any sort of claim under sections 2-7 and 2-10 of the Power of Attorney Act is contingent upon whether the power of attorney in the instant case is valid in the first place, we find just reason to delay the appeal.

### III. CONCLUSION

For the foregoing reasons, we dismiss the appeal.

Appeal dismissed.

APPLETON and TURNER, JJ., concur.