In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 14-3232

VDF FUTURECEUTICALS, INC.,

*Plaintiff-Appellant,*

*v.*

STIEFEL LABORATORIES, INC., *et al.,*

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 407 — **John W. Darrah**, *Judge.*

---

ARGUED MAY 29, 2015 — DECIDED JULY 10, 2015

---

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* In this needlessly complex case (the plaintiff's complaint is 33 pages long and consists of 184 paragraphs), with federal jurisdiction based on diversity of citizenship and the governing substantive law that of Illinois, the parties are wrangling over a license agreement. The agreement—40 pages of fine print, including numerous

amendments—is between the plaintiff, VDF FutureCeuticals, Inc., and one of the three defendants, J&J Technologies, LC (the other two defendants are Stiefel Laboratories, Inc., and Joseph A. Lewis II). VDF has trademark and patent rights in "CoffeeBerry," an extract from the whole fruit (not just the bean) of the coffee plant.

The agreement licensed J&J (managed by defendant Lewis, formerly a 45 percent owner of the company, as was another of the company's three owners) to make and sell CoffeeBerry-based skin-care products to which VDF has the intellectual property rights. In other words, the agreement licensed J&J to "commercialize" VDF's intellectual property. The license required J&J to remit to VDF, as royalties, 15 percent (later raised to a third) of any revenues that J&J obtained from selling the licensed product, and of any royalties that J&J received from firms to which it granted sublicenses. All the royalties received by VDF would be what are called "running royalties," that is, royalties based on the number of sales by the licensee (J&J), or by sublicensees of the licensed product. Regarding sublicensees, the license permitted J&J to sublicense its rights under the license "in the exercise of [J&J's] sole discretion and judgment" (altered to "in the exercise of its best judgment" by an amendment in 2006).

The license also required J&J to pay VDF, at a minimum, a specified alternative quarterly royalty in order to protect VDF in the event that the running royalties fell below a specified level in particular quarters. The license provided that it could not be assigned without VDF's written permission, but it did not forbid a change of control of J&J, and this omission has turned out to be critical.

The license was issued in 2004. Two years later J&J sublicensed defendant Stiefel, a subsidiary of GlaxoSmithKline. Stiefel was a natural to become involved in VDF's business because it's a manufacturer of dermatological products and VDF hoped CoffeeBerry would become an ingredient of such products.

Four years later, J&J's three owners sold their ownership interests to Stiefel for $8.5 million (a third of which was held back pending VDF's written acknowledgement of the membership change, but we can ignore that detail). J&J thereupon became a Stiefel subsidiary and, VDF claims, obligingly agreed to reduce Stiefel's royalty obligation (remember that Stiefel was J&J's sublicensee) and otherwise hurt itself, for example by abandoning, when Stiefel terminated the sublicense that J&J had given it, the right under the sublicense to a $1 million termination fee.

Stiefel's internal documents state that its reasons for buying J&J's stock rather than taking an assignment of J&J's license from VDF were both to avoid having to get VDF's permission for an assignment and (since Stiefel would now control J&J) to reduce the royalties that Stiefel would have to pay for its marketing of CoffeeBerry. Two months after buying J&J's stock, Stiefel engineered an amendment to the sublicense agreement (that is, the agreement that made Stiefel a sublicensee of J&J) that reduced the alternative minimum royalties that Stiefel owed J&J. The effect was to divert part of the license-revenue stream from VDF and J&J to Stiefel.

Two years later (2012) VDF filed this lawsuit, charging J&J, Stiefel, and Lewis with having committed a variety of unlawful acts. These included multiple breaches of contract, including what VDF contends was the de facto assignment

of J&J's license to Stiefel without VDF's approval, breach of
the common law duty of good faith and fair dealing in the
performance of a contract, failure to use "commercially rea-
sonable efforts to make, use, sell, and otherwise commercial-
ize" the licensed products (in other words, failure to use
"best efforts" to promote those products), failure to pay VDF
a third of the $8.5 million purchase price for J&J's stock as an
advance royalty, and ultimately shutting down J&J's busi-
ness to cut off royalties to VDF. The complaint also asks that
the veil be pierced so that Lewis and Stiefel can be charged
with J&J's misdeeds. Those two defendants are further
charged with conspiring to appropriate the royalties and
other contract payments due VDF under the license agree-
ment. In addition, Lewis is charged with unjust enrichment
and conversion as a result of that appropriation and with
breach of fiduciary duty to VDF, and Stiefel with tortious
interference with the VDF license. And for good measure all
three defendants (Stiefel, Lewis, and J&J) are charged with
conspiring to interfere with the license.

The district judge granted summary judgment in favor of
the defendants with respect to two of VDF's claims: that the
defendants had engineered an unauthorized assignment of
the J&J license and that the $8.5 million that Stiefel had paid
to acquire J&J was really a purchase of J&J's anticipated sales
revenue under the license agreement and a third of that rev-
enue should therefore have gone to VDF as advance royal-
ties.

The district judge certified his ruling for an immediate
appeal even though VDF's numerous other claims against
the defendants remain pending in the district court unre-
solved. Fed. R. Civ. P. 54(b) provides that "when an action

presents more than one claim for relief … the court may direct entry of a final judgment as to one or more, but fewer than all, claims … only if the court expressly determines that there is no just reason for delay." If the court does enter final judgment, the judgment is immediately appealable, just like a conventional final judgment—one that winds up the entire case in the trial court—provided that the claim or claims resolved by the judgment do not so overlap claims remaining in the district court as to create needless duplication of effort to resolve the parties' entire dispute. *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1366–68 (7th Cir. 1990); *Spiegel v. Trustees of Tufts College*, 843 F.2d 38, 44–46 (1st Cir. 1988); 10 Wright & Miller, *Federal Practice & Procedure* § 2657 (3d ed.). An example of needless duplication is the appeal to this court of a claim that might be undercut by the resolution of a factual dispute not yet decided by the district court.

There is some overlap in this case between the claims before us on appeal and those yet to be resolved in the district court. The overlap arises from the fact that all the claims ultimately derive from Stiefel's purchase of all the stock of J&J. But the overlap is far from complete, because VDF's assignment and advance-royalty claims, the only ones before us on this appeal, focus on the sale of J&J's stock to Stiefel, while VDF's best-efforts claim, along with related claims pending in the district court (most of which appear to be similar to and may be encompassed by the best-efforts claim), focus on events that took place after the sale of J&J's stock by its owners to Stiefel.

In addition the claims pressed in this appeal have been fully briefed and argued, are ripe for decision, and are easily

resolved; as we're about to see, they have no merit and thus were properly dismissed by the district court. Remaining for trial are stronger claims by VDF pending in the district court. The claim for breach of the best-efforts clause in the license agreement is particularly strong because how could J&J be found to have been exerting "commercially reasonable efforts to make, use, sell, and otherwise commercialize" CoffeeBerry, as the license obligated it to do, when as a result of its becoming owned by Stiefel it reduced its royalty payments to VDF without compensation?

Were we to dismiss the appeal we might well see in a subsequent appeal the same two claims before us in this appeal. For even if VDF prevails on other claims in the district court, it might challenge that court's dismissal of the claims before us in the present appeal in the hope of obtaining greater damages by proving more violations.

So we turn to the two claims before us—that the defendants effected an unauthorized assignment to Stiefel of the license that VDF had granted to J&J and that the $8.5 million that Stiefel paid to acquire J&J was a purchase of J&J's anticipated royalty revenue under the license and so a third of the $8.5 million should have gone to VDF as advance royalties. A fatal problem with the first claim is that by failing to place any restrictions on who could own its licensee J&J, VDF exposed itself to being taken advantage of by a change of ownership at J&J that would result in operating changes and alter its relationship to VDF. Had Stiefel bought J&J's license, or instead bought J&J and dissolved the company so that when the dust settled all that Stiefel would have obtained from the purchase was the license, Stiefel would have violated the terms of the license by obtaining it without VDF's

consent. *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 788–89 (7th Cir. 1995) (Illinois law). That didn't happen. J&J remained in existence after its acquisition by Stiefel, as VDF's licensee and Stiefel's sublicensor.

It's true as we've seen that the agreement between J&J and Stiefel to reduce the alternative minimum royalties owed by Stiefel to J&J reduced the income that VDF received from the license. But Stiefel's negotiations that had led to this untoward consequence for VDF had been not with J&J but with its three owners. This makes a difference so far as Stiefel's allegedly malign interference with and manipulation of J&J are concerned. A change in ownership is likely to result in a change in operations. That the change in how J&J was operated was adverse to the licensor's interests is why with clearer foresight VDF would have included restrictions in the license on changes in the ownership of its licensee, J&J. Its failure to do so was fatal, because "the courts have held that the sale of all the stock in a closely held corporation whose principal asset is a contract does not violate a nonassignment clause even when the stock is sold to a person to whom, previously, the counterparty had explicitly refused that the contract be assigned. If the counterparty to a contract with a corporation wishes to limit the persons to whom ownership or control of the corporation can be sold, it must do this through specific language to that effect in the contract (a 'change of control' clause); a nonassignment clause will not suffice." Kenneth Ayotte & Henry Hansmann, "Legal Entities as Transferable Bundles of Contracts," 111 *Michigan Law Review* 715, 724 (2013). "[T]he mere change of stock ownership would not nullify a non-assignable license, absent a change in control provision." Elaine D. Ziff, "The Effect of Corporate Acquisitions on the Target Company's Li-

cense Rights," 57 *Business Lawyer* 767, 789 (2002); see *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, *supra*, 69 F.3d at 788–89.

Were this not the rule, routine anti-assignment clauses would impede liquidity in the market for corporate control. Sizeable corporations are likely to be party to many contracts, often containing anti-assignment clauses similar to the one in VDF's license to J&J. Were such clauses interpreted to prohibit changes in the control of an acquired corporation, acquirers (such as Stiefel in this case) would have to negotiate (and therefore pay something) for the consent of the licensors of the acquired corporation to any changes in the control of the licensee that the acquirer wanted to make.

This analysis doesn't leave VDF remediless, because the license it granted J&J required J&J to use its best efforts to promote the sale of VDF's products and to remit the royalties generated by those sales to VDF; and J&J, under the influence of Stiefel and Lewis, may have done neither. But that is an issue that the district court has yet to address.

VDF's second claim in this appeal is that the $8.5 million that Stiefel paid J&J's owners for their stock constituted advance royalties, a third of which therefore were owed to VDF. Although Stiefel's willingness to pay that price was (as Stiefel's own documents confirm) based on a forecast of J&J's future royalty receipts from sales of CoffeeBerry, the license that VDF had granted J&J limited the royalties that J&J would owe VDF to money "based on the actual sale of [CoffeeBerry] Products by Licensee or its sublicensees which are actually collected by Licensee." J&J's owners sold stock, not CoffeeBerry products, to Stiefel, and they rather than J&J received the $8.5 million that Stiefel paid for their company's

stock. VDF's interpretation of the royalty provision in the license would require a seller of corporate stock to pay a portion of the purchase price to the corporation's licensors, a portion estimated from the expected cash flow from exploiting the acquired corporate assets to generate revenue. See Ben McClure, "Digging into the Dividend Discount Model," *Investopedia*, www.investopedia.com/articles/fundamental/04/041404.asp (visited July 9, 2015). Such a requirement, involving complex and contestable financial estimations, would be another impediment to the smooth operation of the market in corporate control.

The appeal, in short, has no merit, and the decision appealed from is therefore

AFFIRMED.