# Illinois Official Reports

## Appellate Court

---

### *In re Estate of Beetler*, 2017 IL App (3d) 160248

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF DEBORAH BEETLER, an Alleged Disabled Person (David E. Beetler, Petitioner-Appellant, v. Tricia Bledsoe, Respondent-Appellee). |
| District & No. | Third District<br>Docket No. 3-16-0248 |
| Filed | August 29, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Knox County, No. 13-P-187; the Hon. Raymond A. Cavanaugh, Judge, presiding. |
| Judgment | Order reversed and remanded. |
| Counsel on Appeal | Daniel G. O'Day, of Cusack, Gilfillan & O'Day, LLC, of Peoria, for appellant.<br><br>Chad M. Long and John W. Robertson, of Statham & Long, LLC, of Galesburg, for appellee. |
| Panel | JUSTICE WRIGHT delivered the judgment of the court, with opinion.<br>Justice Lytton concurred in the judgment and opinion.<br>Justice Schmidt specially concurred, with opinion. |

**OPINION**

¶ 1      In 2013, Deborah Beetler executed a power of attorney authorizing her husband, David E. Beetler, to make her health care decisions. In 2014, the trial court appointed another person to serve as plenary guardian over Deborah's estate and also authorized the guardian to remove Deborah's person from David's care and place her in a residential facility. In 2016, David requested the court's permission for David to make arrangements to reline Deborah's dentures contrary to the wishes of the court-appointed guardian. The court denied David's request after finding the guardianship implicitly terminated David's authority to make any health care decisions for his wife after the plenary guardianship was established in 2014. We reverse.

¶ 2      FACTS

¶ 3      On August 29, 2013, Deborah executed an Illinois statutory short form power of attorney for health care giving her husband, David, permission to act as her attorney for purposes of making her health care decisions. The document authorized David to make any and all decisions for Deborah concerning her "personal care, medical treatment, hospitalization and health care." This document became effective upon its execution on August 29, 2013, and remains effective until Deborah's death. However, Deborah did not execute a power of attorney designating someone to handle her estate or financial affairs.

¶ 4      A. 2014 Guardianship Proceedings

¶ 5      On October 28, 2013, Barbara Foster, a caseworker for Alternatives for Older Adults, petitioned the court to appoint a guardian over the person and estate of Deborah, a disabled person. According to the petition, Deborah was 64 years old in 2013 and suffered from dementia, resulting in her status as a disabled adult.

¶ 6      Foster's petition for temporary guardianship requested that the court enter an order appointing Deborah's daughter, Tricia Bledsoe, to serve as temporary guardian of Deborah's person and estate, pending a full hearing on the allegations contained in the petition for plenary guardianship. The petition for temporary guardianship alleged Deborah's current caretaker was neglecting and physically abusing Deborah.

¶ 7      The petition for plenary guardianship, filed on the same date, requested the court to designate Bledsoe as the plenary guardian of Deborah's person and estate. Neither petition advised the court that Deborah had executed a power of attorney for health care naming David as her agent. Foster's attorney filed a proof of service, certifying that David and Deborah's two children were served with copies of the petitions for temporary and plenary guardianship and a notice of hearing by mail on October 28, 2013.

¶ 8      On October 28, 2013, the court entered an order appointing Bledsoe as temporary guardian of Deborah's person and estate. The court order dated October 28, 2013, specified that "the authority of the Temporary Guardian under this Order shall supersede all agencies executed on behalf of Deborah pursuant to the Illinois Power of Attorney Act." The court also appointed a guardian *ad litem* for Deborah. On October 28, 2013, Deborah was removed from her home and placed in a residential care facility. To date, she has remained in the residential care facility.

¶ 9        On February 25, 2014, David filed an answer to Foster's petition and counterpetition requesting the court to appoint David as Deborah's plenary guardian for both her person and estate. On April 3, 2014, the trial court conducted an evidentiary hearing concerning Foster's petition for plenary guardianship and David's counterpetition. During the evidentiary hearing conducted on April 3, 2014, Judge Standard received testimony from approximately 14 witnesses, including Foster, Bledsoe, David, and various relatives and health care professionals.

¶ 10       During the 2014 hearing, Foster explained to the court that, in August 2013, she investigated reports that Deborah had been wandering away from her home on multiple occasions due to inadequate supervision. As part of her investigation, Foster visited Deborah and David's home on multiple occasions. On the first visit, a woman named Pat Turner, a family friend, was present outside Deborah's home. Turner spoke to Foster and told Foster she could not speak with Deborah at that time because Deborah suffers from dementia. Foster then approached the front door, knocked, and spoke to Deborah. During this brief conversation, Foster observed Deborah had fresh blood on her forehead and clothing. Shortly thereafter, Turner and her husband both directed Foster to leave the premises and instructed Foster to contact David for information about Deborah's well-being. Foster complied with their request.

¶ 11       A few days later, Foster returned to Deborah's home and spoke face-to-face with David. David advised Foster that while he was away from the home, a person named Jim Clayton provided supervision for Deborah. The record reveals David is employed during the weekdays and must be away from the household. During David's work hours, David believed Clayton was supervising Deborah's activities.

¶ 12       According to David, Clayton lived in the basement of the Beetler home. During Foster's visit, David allowed Foster to speak with Deborah. Foster attempted to evaluate Deborah for competency. Foster described David as polite but very guarded.

¶ 13       Foster returned to the Beetler home on another occasion in late August 2013. A woman named Connie Turner, a relative, was present at this time and answered the door. While Foster was seated on the couch having a "very cordial" conversation with Deborah, Deborah unexpectedly became agitated and "attacked" Foster. Foster left the residence shortly thereafter to diffuse the situation.

¶ 14       During the 2014 evidentiary hearing, the court received testimony from over 10 witnesses, including friends, family, and Deborah's caregivers. For example, Kim Norville testified she was a family friend and witnessed David and Deborah engaged in a physical confrontation as the couple was travelling down the roadway in their vehicle. According to Norville, David seemed to be yelling at his wife and beating on the steering wheel as he drove. The court received testimony about David's care plan for his wife, which involved volunteer caregivers that had a prior relationship with Deborah through connections with her church, neighborhood, and family. This network of volunteers spent time supervising Deborah when David found it necessary to be away from his wife due to work or other commitments. The court also received information from current and past caregivers describing Deborah's mental state and combative nature at times. The court received undisputed testimony indicating David has a calming effect on Deborah, causing her to be less agitated in his presence at times.

¶ 15       The court also received testimony from both Bledsoe and David in support of their separate requests to be named as Deborah's guardian. Bledsoe advised the court of the need for residential placement due to Deborah's advanced dementia but conceded her mother trusted

David. David expressed concerns about the inadequate care he perceived Deborah was currently receiving from the residential care facility, his desire to maintain her dignity, and his hopes of avoiding further decline of her mental focus by improving her quality of life.

¶ 16    After the extensive evidentiary hearing in 2014, Judge Standard found that Deborah lacked the capacity to make decisions concerning the care of her person and the management of her finances due to her dementia. The court also found that placement in a secure facility under 24 hour supervision, as recommended in a physician's report, was in Deborah's best interests. The court judiciously noted the difference in expressed perspectives of David, a devoted spouse, and Bledsoe, a devoted daughter. The trial court's finding did not contain an express or implied conclusion that either David or Bledsoe had been abusive towards Deborah in the past. The court's findings addressed the "tragic situation" resulting from the progression of Deborah's disease and commented on the "anguish" resulting from Deborah's circumstances. After making certain findings of fact, the trial court entered an order on April 22, 2014, selecting Bledsoe as the person to serve as the plenary guardian for Deborah's person and estate.

¶ 17    The court's announced findings and written order dated April 22, 2014, were silent and did not explicitly address the prior agency created by Deborah pursuant to the Illinois Power of Attorney Act (Power of Attorney Act) (755 ILCS 45/1-1 *et seq.* (West 2016)). The court order granted Bledsoe "the power and authority to place the Ward in a residential facility," a decision David hoped to avoid with an alternative plan for home health care. The trial court found David's plan to be unrealistic in light of the medical testimony the court received. Before ending the proceeding, the trial court provided compassionate guidance urging the family that was divided on the issue of residential care to try to get beyond their differences and "stand at [Deborah's] bedside side by side."

¶ 18    The April 22, 2014, court order dictated that "Letters of Guardianship shall issue in accordance with the provisions of this Order." On April 22, 2014, the deputy circuit clerk issued letters of guardianship. The letters state, in relevant part, that Bledsoe, as the plenary guardian, shall have the powers "[t]o arrange for and consent to any and all medical and/or dental tests and/or examinations which are reasonably required for the ward" and "[t]o consent to medical and/or dental treatment on behalf of the ward; including surgery, as is reasonably required for the ward, except where contrary to law." The letters were not signed by a judge.

¶ 19                                    B. 2016 Health Care Request

¶ 20    On February 12, 2016, nearly two years after Judge Standard appointed Bledsoe to act as her mother's plenary guardian, David filed a motion in the circuit court seeking an order allowing him to arrange for certain dental services pursuant to his authority as Deborah's power of attorney for health care. The matter was assigned to Judge Cavanaugh.

¶ 21    On March 1, 2016, David filed an amended motion to correct a pagination error. In the amended motion, David stated he desired for his wife to have her denture relined because Deborah was "having difficulty eating because of the placement of her teeth, gums, and denture." The amended motion informed the trial court that Deborah's plenary guardian, Bledsoe, opposed the dental procedural David felt was necessary for his wife's well-being.

¶ 22    David attached an affidavit to the amended motion to allow dental services from Dr. Adam Welty, DMD, in support of the proposed dental procedure. In the affidavit, Dr. Welty stated that he visited Deborah at the nursing facility and examined Deborah's maxillary denture. Dr. Welty determined the denture was loose fitting and provided no retention. Dr. Welty stated that

in his experience, most patients in long-term care facilities lose weight and their dentures no longer fit due to loss of tone, muscle, and fatty tissue in their mouths. Dr. Welty recommended that Deborah receive a reline procedure, which essentially refits the existing denture. Dr. Welty stated that the procedure does not always ensure retention and denture adhesive may still be necessary. However, Dr. Welty opined that in Deborah's case, a reline would dramatically improve the fit of Deborah's upper denture. Finally, Dr. Welty stated that his observations and opinions were based on his education and experience and his opinions were made to a reasonable degree of dental certainty.

¶ 23    On February 22, 2016, Bledsoe filed a response to the motion to allow dental services. In the response, Bledsoe argued that the proposed denture reline procedure would not be in Deborah's best interest due to her progression into end-stage dementia that resulted in her current hospice care. Further, Bledsoe alleged solid food creates a choking hazard for Deborah. Thus, according to Bledsoe's response, Deborah did not require a denture for consumption because she was on a pureed diet. Bledsoe's response indicates Bledsoe did not agree that Deborah had difficulty eating on the pureed diet. Bledsoe stated Deborah was unable to follow instructions or to report pain that could develop with a possible denture reline due to Deborah's nonverbal status as an end-stage dementia patient.

¶ 24    On April 8, 2016, Judge Cavanaugh conducted an evidentiary hearing on David's amended motion to allow dental services for his wife. The court heard testimony from Dr. Welty on behalf of David concerning the proposed denture reline procedure and the benefits it would provide to Deborah. Marcy Olmsted, R.N., Deborah's case manager at hospice, testified the proposed procedure would have a negative impact on Deborah. David and Bledsoe provided their own testimony to the trial court.

¶ 25    After hearing all of the evidence and the arguments of the attorneys, the court found the denture reline might provide cosmetic benefits for Deborah but would not be in Deborah's best medical interests. Further, the court order dated April 8, 2016, found, as a matter of law:

> "That the Court's Order dated April 22, 2014, appointing Tricia Bledsoe as Guardian of the Person and Estate of Deborah Beetler, obviates and supersedes any Illinois Power of Attorney for Health Care executed by Deborah Beetler."

¶ 26    On May 5, 2016, David filed a timely notice of appeal challenging the trial court's denial of his amended motion to allow dental services filed pursuant to his authority as Deborah's power of attorney for health care.

¶ 27                               ANALYSIS

¶ 28    In this appeal, David argues Deborah's 2013 decision to designate David as her agent for purposes of making her health care decisions was not extinguished by the 2014 order appointing Bledsoe as plenary guardian of Deborah's person and estate. Bledsoe submits the 2014 guardianship implicitly revoked David's authority to make any health care decisions for Deborah after the court found Deborah to be a disabled adult and appointed a guardian on her behalf.

¶ 29    Before Foster filed a petition under section 11a-3 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a-3 (West 2012)), Deborah made her own arrangements by selecting David as the person she trusted to make her future health care decisions, if necessary. To date, no person has filed a petition in the circuit court pursuant to section 2-10 of the Power of Attorney Act

(755 ILCS 45/2-10 (West 2016)) seeking to set aside or requesting a judicial determination that David's agency should be terminated.

¶ 30    Hence, in this appeal, we focus on a very narrow issue. Namely, this court must determine whether Deborah's 2013 decision to designate David as her agent for purposes of making her health care decisions under the Power of Attorney Act survives the subsequent 2014 judicial decision appointing Bledsoe as the plenary guardian. The issue in this appeal involves a question of law subject to *de novo* review. See *In re Estate of Wilson*, 238 Ill. 2d 519, 552 (2010) ("Statutory construction presents a question of law which we review *de novo*.").

¶ 31    With great foresight, our lawmakers provided statutory guidance for courts facing the precise issue presented in this appeal involving the interface between the Power of Attorney Act (755 ILCS 45/1-1 *et seq.* (West 2016)) and a guardianship proceeding for a disabled adult pursuant to the Probate Act (755 ILCS 5/1-1 *et seq.* (West 2016)). It is clear that David's authority to make any health care decisions for his wife arises solely out of an agency relationship created by his wife under the Power of Attorney Act in 2013.

¶ 32    The Power of Attorney Act provides that an individual, such as Deborah, "has the right to appoint an agent to make property, financial, personal, and health care decisions for the individual." 755 ILCS 45/2-1 (West 2016). The Power of Attorney Act establishes that the principal may empower another person to act as their agent "throughout the principal's lifetime, including during periods of disability" and the principal must "have confidence that third parties will honor the agent's authority at all times." 755 ILCS 45/2-1 (West 2016). Section 2-5 of the Power of Attorney Act provides, in pertinent part, as follows:

> "Unless the agency states an earlier termination date, the agency continues until the death of the principal, notwithstanding any lapse of time, the principal's disability or incapacity or appointment of a guardian for the principal after the agency is signed." 755 ILCS 45/2-5 (West 2016).

Next, section 2-6(a) of the Power of Attorney Act states:

> "All acts of the agent within the scope of the agency during any period of disability, incapacity or incompetency of the principal have the same effect and inure to the benefit of and bind the principal and his or her successors in interest as if the principal were competent and not a person with a disability." 755 ILCS 45/2-6(a) (West 2016).

The statutory scheme makes it clear that this agency is strictly protected from judicial intervention except under a very narrow set of rigid procedural circumstances. Specifically, section 2-10 of the Power of Attorney Act provides, in relevant part, as follows:

> "(a) Upon petition by any interested person (including the agent), with such notice to interested persons as the court directs and a finding by the court that the principal lacks either the capacity to control or the capacity to revoke the agency, the court may construe a power of attorney, review the agent's conduct, and grant appropriate relief including compensatory damages.
>
> (b) If the court finds that the agent is not acting for the benefit of the principal in accordance with the terms of the agency or that the agent's action or inaction has caused or threatens substantial harm to the principal's person or property in a manner not authorized or intended by the principal, the court may order a guardian of the principal's person or estate to exercise any powers of the principal under the agency, including the power to revoke the agency, or may enter such other orders without

appointment of a guardian as the court deems necessary to provide for the best interests of the principal." 755 ILCS 45/2-10 (West 2016).

¶ 33 We consider the statutory mandates associated with a plenary guardianship proceeding for a purported disabled adult. Section 11a-17(c) of the Probate Act recognizes the agency created by a valid power of attorney may survive a disability and the appointment of a plenary guardian. 755 ILCS 5/11a-17(c) (West 2016). Section 11a-17(c) of the Probate Act provides that "[a]bsent [a] court order pursuant to the Illinois Power of Attorney Act directing a guardian to exercise powers of the principal under an agency that survives disability, *the guardian has no power*, duty, or liability *with respect to any personal or health care matters covered by the agency*." (Emphases added.) 755 ILCS 5/11a-17(c) (West 2016). Thus, the Probate Act is entirely consistent with section 2-10 of the Power of Attorney Act, cited above.

¶ 34 Based on the representations of fact emphasized by Bledsoe's attorney during oral arguments before this court, we recognize that both David and Bledsoe care deeply about Deborah's comfort, care, and well-being but face significant challenges due to her advancing illness in spite of her young age. As Bledsoe's counsel pointed out during the argument before this court, once Bledsoe placed her mother in the residential facility in 2013, David and Bledsoe have not had any noteworthy conflicts over Deborah's day-to-day health care, with the exception of the denture issue that arose in 2016.

¶ 35 Bledsoe concedes that the 2014 order did not explicitly terminate David's status as the power of attorney for health care for Deborah. Importantly, since becoming her mother's plenary guardian, Bledsoe has not petitioned the court to explicitly revoke her mother's 2013 power of attorney as contemplated by section 2-10 of the Power of Attorney Act.[1] Yet, Bledsoe argues that the 2014 order *implicitly* revoked the agency relationship under the Power of Attorney Act and relies heavily on the decision of *In re Estate of Doyle*, 362 Ill. App. 3d 293 (2005). We do not find the rationale in *Doyle* to be persuasive and decline to follow this Fourth District decision.

¶ 36 In *Doyle*, the trial court appointed a son-in-law as plenary guardian of his mother-in-law's estate. *Doyle*, 362 Ill. App. 3d at 296-97. On appeal, the daughter argued, among other things, that the order appointing the son-in-law as the guardian was void because her mother previously executed a power of attorney giving the daughter the exclusive authority to make decisions affecting mother's property. *Doyle*, 362 Ill. App. 3d at 299.

¶ 37 The appellate court found the judicial determination to appoint a plenary guardian "implicitly revoked" the daughter's agency pursuant to section 2-10 of the Power of Attorney Act. *Doyle*, 362 Ill. App. 3d at 299. The appellate court explained that, although no petition was filed under section 2-10 of the Power of Attorney Act, all interested parties in the case were notified and had knowledge other persons were asking to become guardians of the disabled person's estate. *Doyle*, 362 Ill. App. 3d at 299-300. The reviewing court noted the trial court heard testimony from a variety of witnesses before granting the request for guardianship. *Doyle*, 362 Ill. App. 3d at 300. Thus, the appellate court concluded that while the trial court did not expressly make reference to section 2-10 of the Power of Attorney Act, the court's order appointing a plenary guardian implicitly met the requirements of section 2-10 of the Power of Attorney Act and stripped the daughter of her prior authority. *Doyle*, 362 Ill. App. 3d at 301.

---

[1]Moreover, Foster's 2014 petition for plenary guardianship did not request the trial court to explicitly revoke Deborah's 2013 power of attorney in favor of David for her health care decisions.

¶ 38    We decline to follow the holding in *Doyle* as contrary to the statutory scheme. Instead, we adopt the rationale expressed by the dissent in that case based on overriding public policy concerns in addition to the mandates of the statutory construction. The dissent explained:

> "The whole idea of the Durable Power of Attorney Law is that the decision of a competent principal to appoint an agent should not be easily overcome. The fact that the court would not have selected the agent selected by the principal is irrelevant; what is important is what the principal thought best, not what the court thinks is best. The legislature would not have enacted the Durable Power of Attorney Law if the solution was the appointment of a guardian of the estate; guardians of the estate could be appointed before the Durable Power of Attorney Law was enacted. The suggestion that whenever a guardian of an estate is appointed any exiting durable power of attorney is revoked is contrary to the spirit and the letter of the Durable Power of Attorney Law." *Doyle*, 362 Ill. App. 3d at 306 (Cook, J., dissenting).[2]

¶ 39    We are unwilling to ignore Deborah's unchallenged power of attorney based on implied assumptions arising out of the 2014 order entered by Judge Standard. Based on strong public policy considerations, we hold that the appointment of a plenary guardian in 2014 by Judge Standard did not automatically extinguish Deborah's preexisting and *unchallenged* power of attorney naming someone, other than a judicially appointed guardian, as her designated agent for health care purposes.

¶ 40    Finally, we consider Bledsoe's argument that the letters of guardianship issued by the deputy circuit clerk in 2014 contained the explicit language necessary to revoke David's authority to make health care decisions for his wife. This argument ignores the April 22, 2014, guardianship order signed by Judge Standard and expressly directed the clerk to prepare the letters of guardianship "*in accordance with the provisions of this Order*." (Emphasis added.)

¶ 41    In this case, the letters of guardianship issued by the deputy circuit clerk contained language beyond the terms contained in the court order dated April 22, 2014. This order gave Bledsoe the power to place her mother in a residential care facility without addressing Bledsoe's authority to make dental care choices for her mother. Therefore, we reject Bledsoe's argument that the letters of guardianship issued by the deputy circuit clerk should be interpreted as a judicial order revoking David's status as Deborah's power of attorney for health care. See 755 ILCS 45/2-10(g) (West 2014); 755 ILCS 5/11a-17(c) (West 2014).

¶ 42    For these reasons, we hold that absent a written court order *explicitly* directing a plenary guardian to exercise the powers of the principal under the agency pursuant to the Power of Attorney Act, the appointment of a plenary guardian does not automatically revoke an existing power of attorney for health care. The decision regarding whether Deborah should receive the proposed denture reline procedure is clearly within the scope of the unchallenged power of attorney for health care document that Deborah executed in 2013 giving David the authority to make such decisions.

¶ 43    On this basis, we reverse the trial court's order dated April 8, 2016, denying David's amended motion to allow dental services for Deborah and remand the matter to the trial court

---

[2]We note that the Illinois Supreme Court referred to the *Doyle* decision in a footnote in *Wilson*, 238 Ill. 2d at 540 n.9. However, the Illinois Supreme Court cited *Doyle* only to explain the procedural posture of the case and did not address the merits of that decision.

for entry of an order consistent with this decision.

¶ 44                                  CONCLUSION

¶ 45        The judgment of the trial court of Knox County is reversed and remanded for entry of an order consistent with this decision.

¶ 46        Order reversed and remanded.

¶ 47        JUSTICE SCHMIDT, specially concurring.

¶ 48        I concur in the judgment. I do not concur in the majority's discussion of *Doyle*. *Supra* ¶¶ 35-38. The facts in *Doyle* were sufficiently dissimilar to the facts in this case that I would simply find *Doyle* inapposite.