2024 IL App (1st) 240319-U

No. 1-24-0319

Order filed December 13, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* NATHANIEL BRYANT, a Person with an Alleged Disability | ) ) ) | Appeal from the Circuit Court of Cook County |
| (Cynthia Griggley, | ) ) | |
| Petitioner-Appellant, | ) ) | |
| v. | ) ) | No. 22 P 1097 |
| Nathaniel Bryant, | ) ) | |
| Respondent, | ) ) | Honorable Stephanie K. Miller, |
| (Julie E. Fox, as Guardian *Ad Litem*, Appellee)). | ) | Judge presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm the circuit court's award of guardian *ad litem* fees where the court did not abuse its discretion.

¶ 2   Petitioner Cynthia Griggley appeals from an order of the circuit court making her liable for

$5,610 in guardian *ad litem* fees performed by Julie E. Fox as *guardian ad litem* in a case where

Griggley filed a petition to be appointed guardian of her husband, Nathaniel Bryant, and his estate due to his alleged disability. Griggley contends that the court erred in awarding Fox fees for all 18.7 hours of work performed where Fox's invoice logs lacked sufficient detail, her appointment as guardian *ad litem* did not require any novel work but rather was akin to document review, and her fees were exorbitant when considering the lack of assets of Griggley. For the reasons that follow, we affirm the circuit court's award of $5,610 of guardian *ad litem* fees to Fox.

¶ 3                                   I. BACKGROUND

¶ 4                              A. Guardianship Proceedings

¶ 5      In June 2019, Bryant suffered a stroke. In July 2020, Bryant executed powers of attorney for property and heath care authorizing Griggley to make decisions on his behalf. Bryant's power of attorney for property authorized Griggley to act on his behalf with respect to any claims and litigation. Less than a year later, Bryant sued several medical providers for malpractice in the law division of the circuit court of Cook County (Case No. 21 L 6259) claiming that their negligence led to his stroke. Despite Bryant suing in his own name, Griggley and their counsel did not believe he could sit for a deposition or otherwise cooperate with discovery given his mental capacity. As a result, they chose to pursue a guardianship to assist with the discovery dilemma.

¶ 6      In February 2022, Griggley filed a petition in the probate division of the circuit court of Cook County to be appointed guardian of Bryant and his estate due to his alleged disability resulting from his stroke. In the petition, Griggley asserted that Bryant had executed powers of attorney authorizing her to make his decisions for both property and health care. Griggley supported the petition with a report of physician from Dr. May Soong, who opined that a "partial guardianship may be warranted" due to Bryant's condition. While Dr. Soong noted that Bryant

"appear[ed] to be capable of making and expressing personal and financial decisions relative to his person in generality," he required assistance with more complex decisions.

¶ 7    During the initial proceedings on the petition, according to Griggley's counsel, Judge Daniel Degnan remarked that it would be more appropriate to utilize Bryant's power of attorney for property to assist with discovery in the underlying medical malpractice case rather than through the appointment of a guardian. Griggley followed this advice and returned to the medical malpractice case in the law division, resulting in Judge Degnan dismissing the probate matter without prejudice when Griggley failed to appear at a status hearing. According to Griggley's counsel, Judge Degnan dismissed the probate matter without prejudice in the event Judge Melissa Durkin, the law division judge, wanted him to review the sufficiency of Bryant's powers of attorney. Back in the medical malpractice case, Griggley's counsel sought a protective order to allow her to provide a deposition on Bryant's behalf and assist him with discovery. However, Judge Durkin denied the request. According to Griggley's counsel, Judge Durkin instructed Griggley to obtain an order from the probate court—though the exact nature of the order is unclear.

¶ 8    As such, in June 2023, Griggley renewed her petition to be appointed guardian of Bryant and his estate due to his alleged disability. In the petition, Griggley re-asserted that Bryant had executed powers of attorney authorizing her to make his decisions for both property and health care. Griggley supported the petition with an affidavit and report of physician from Dr. Ender Akan, who averred that, due to Bryant's current condition, he did not have the capacity to sit for a deposition. In the report of physician, Dr. Akan asserted that Bryant was "totally incapable of making financial or medical decisions for himself." Based on the renewed petition, the circuit court

ordered Fox to be appointed guardian *ad litem* for Bryant.[1] In that order, the court directed Fox to personally observe Bryant, communicate to him about the contents of Griggley's petition, attempt to determine his position concerning the proceedings, and prepare a written report on the matter. In a later order, the court noted that it appointed Fox as guardian *ad litem* because the petition could not be withdrawn without leave of the court and it had concerns about Bryant that Fox needed to investigate.

¶ 9    In July 2023, Fox filed her written report as guardian *ad litem*. According to the report, Fox reviewed Bryant's powers of attorney, which appeared valid on their face, though she raised an issue with the timing of their execution given Bryant's debilitating stroke and his current condition. According to Fox, when she raised this issue with Griggley's attorney, the attorney told Fox that since the initial filing of the petition, Bryant had suffered "mini-strokes," which caused further mental deterioration. Given the circumstances, Fox was unsure whether Bryant had the capacity to execute the powers of attorney. Because valid powers of attorney would obviate the need for a guardian, Fox requested medical records of Bryant contemporaneous to the time he executed the powers of attorney in order to determine whether he had the capacity to execute them.

¶ 10    On the day Fox filed her report, the parties also appeared in court, where Fox reiterated the need to determine whether Bryant was competent to execute the powers of attorney. Griggley's counsel responded that she did not have any medical records of Bryant's from July 2020. Instead, counsel could only provide records from a hospitalization that concluded in May 2020 and records from around December 2020. Based on the proceedings, including Fox's highlighting that a power of attorney would obviate the need for a guardian, counsel informed the circuit court that she

---

[1] Judge Stephanie K. Miller began presiding over the case at this point.

wanted to resolve the discovery issues in the medical malpractice case using Bryant's power of attorney for property rather than through a guardianship proceeding. While Fox agreed that using a power of attorney to prosecute a lawsuit of an individual under a mental disability was easier than obtaining a guardianship, Fox believed that she still needed to determine whether Bryant had the competency to execute the powers of attorney. As a result, Fox still requested to review Bryant's relevant medical records. According to Griggley's counsel, she could provide "5,400 pages of medical records" from Bryant's hospitalization ending in May 2020 and records from December 2020. To this end, the circuit court ordered Griggley to tender "[Bryant's] relevant medical records from May 2020 or as close to the July 2020 execution [of the powers of attorney] as possible" for Fox to review.

¶ 11    Immediately after the status hearing, Fox e-mailed Griggley's counsel to discuss the medical records. Fox remarked that she did not need 5,000 pages of records from Bryant's May 2020 hospitalization. Rather, according to Fox, "[a] face [sheet], summary, medical history and any neurology and or psychiatry exams and reports" would be sufficient. Griggley's counsel responded that she did not have time to sift through the medical records to fulfill Fox's request because of other, more pressing work. Ultimately, Griggley's counsel provided Fox a file-sharing link with medical records of Bryant's from a hospitalization at Franciscan Health Hammond between April and May 2020, a hospitalization from December 2020 and additional medical records from 2011 through 2019.

¶ 12    The day prior to the parties' next status hearing, Fox filed a supplemental guardian *ad litem* report and noted that she had reviewed "thousands" of pages of medical records of Bryant's from 2011 to 2021. Based on Fox's review of those medical records, in particular, one from May 1, 2020, she believed that Bryant had the competency to execute the powers of attorney. Fox's

conclusion was buttressed by an affidavit of Patrick Hart, the attorney whom Griggley retained to prepare the powers of attorney and help in the execution of them. In that affidavit, Hart averred that Bryant was lucid and capable of understanding what he was doing when executing the powers of attorney. Based on her investigation, Fox concluded that Griggley should be allowed to withdraw her guardianship petition and be able to pursue litigation in the underlying medical malpractice case using Bryant's power of attorney for property.

¶ 13 During the status hearing, Griggley's counsel requested leave from the circuit court to withdraw the guardianship petition. The court acceded to this request, but noted it would retain jurisdiction on any fee petition Fox filed. Griggley's counsel, however, remarked that Griggley and Bryant did not have any funds to pay Fox's fees. In response, Fox noted that her fees could be considered part of the underlying medical malpractice litigation as Griggley had to pursue a probate action based on the direction of Judge Durkin. To this end, Fox likened her fees to costs of litigation similar to paying for a sheriff for service or filing fees. Following the hearing, the court entered a written order finding that Bryant's powers of attorney were valid and properly executed, and it granted Griggley leave to withdraw her petition. The court also discharged Fox as guardian *ad litem* and granted her leave to file a fee petition.

¶ 14 B. Fee Petition

¶ 15 Thereafter, Fox filed a petition for guardian *ad litem* fees. Fox stated that she rendered 18.7 hours of service as guardian *ad litem*, which included "[r]eview[ing] extensive medical records from 2011-2021." Although Fox's customary hourly rate was $400, she requested a reduced hourly rate of $300. In turn, Fox sought $5,610 in fees. Fox attached to her petition an invoice log detailing her work. In relevant part, from August 30, 2023, through September 10, 2023, Fox asserted that she spent 8.3 hours reviewing various medical records of Bryant's. Specifically, on August 30,

Fox: "[r]eviewed medical records of [Bryant's] near July 2020 signing of POAs: from March 5-7, 2020 admission to Franciscan Health Hammond" for 0.6 hours; "[r]eviewed medical records of [Bryant's] near July 2020 signing of POAs: Franciscan Health Hammond Care from April 30, 2020 admission" for 0.2 hours; "[c]ontinued review of medical records of [Bryant's] near July 2020 signing of POAs. Still on [April 30, 2020] Franciscan Hammond admission" for 0.5 hours; and "[c]ontinued review of medical records of [Bryant's] near July 2020 signing of POAs. Still on [April 30, 2020] Franciscan Hammond admission" for 0.6 hours. Additionally, on September 8, Fox "[c]ontinued reviewing medical records" for 1.9 hours; on September 9, she "[c]ontinued reviewing medical records" for 1.2 hours; on September 10, she "[c]ontinued reviewing medical records" for 1.7 hours; and later on September 10, she "[r]eviewed medical records from 2011-2020" for 1.6 hours.

¶ 16    The following week, in the medical malpractice action in the law division, Bryant filed a motion to substitute Griggley, as his duly appointed power of attorney, as the party plaintiff in the case and for leave to file a third amended complaint reflecting that substitution. In the motion, Bryant referred to, and attached, the probate court's order finding his powers of attorney valid and properly executed. Based on our review of the Cook County Circuit Court's Online Case Search, of which we may take judicial notice (see *In re County Treasurer of Cook County*, 2024 IL App (1st) 220670, ¶ 86), Bryant's motions were allowed.

¶ 17    Griggley objected to Fox's petition, arguing that her request was unreasonable and inexcusably vague. Griggley posited that Fox failed to contact necessary parties who were present at the time Bryant executed his powers of attorney, including Hart and other witnesses. Instead, according to Griggley, Fox wasted precious time—and rendered fees therefrom—reviewing thousands of pages of irrelevant medical records that predated Bryant's stroke. According to

Griggley, the only medical records arguably relevant were those related to Bryant's hospitalization ending in May 2020 and a review of those records should not have taken as long as Fox claimed. Griggley requested that the circuit court reduce Fox's fees to reflect 4.9 hours of work.

¶ 18    During argument on Fox's fee petition, Fox remarked that all of her work was in furtherance of the circuit court's instructions. Fox hypothesized that, if she did the opposite of what occurred in this case and failed to review "the 5,000-odd pages" tendered by Griggley's counsel, she would be "in dereliction" of her duty as guardian *ad litem*. Fox asserted that she did not solely rely on the affidavit of Hart because he was an attorney and could only render his non-medical opinion as to Bryant's competency to execute the powers of attorney. Fox argued that her review of the "5,000 pages of medical records" was reasonable. Griggley's counsel argued consistently with her written objection.

¶ 19    Following argument, the circuit court entered a written order on Fox's fee petition. The court noted that Fox reviewed approximately 5,000 pages of medical records even though it had instructed Griggley's counsel to "narrow" the scope of the records. The court observed that Fox's meticulous review of the records led the court to find that Bryant's powers of attorney were valid. In turn, according to the court, Griggley used the court's finding, and necessarily Fox's work, to "advance" Bryant's medical malpractice case. The court acknowledged that Fox did not speak to certain parties who witnessed Bryant execute the powers of attorney, but concluded more was needed to make a finding about Bryant's competency to execute the powers of attorney. Although the court acknowledged no estate had been created in the guardianship case because it did not proceed that far, it asserted that Fox should still be compensated for her work. While the court determined it could not legally make Griggley's attorney liable for the fees as "a cost of litigation," it awarded Fox $5,610 in fees, as she requested, to be paid by Griggley.

¶ 20    Griggley filed a motion to reconsider, claiming that the motion was based on new facts, specifically that, contrary to Fox's representations, there were less than 2,000 pages of medical records from Bryant's May 2020 hospitalization. Griggley supported this assertion with an affidavit from a legal assistant of Griggley's counsel, who also averred that she reviewed those records in only four hours. Griggley also contended that, contrary to the circuit court's finding, medical records were not necessary to determine whether Bryant had the capacity to execute the powers of attorney. The court denied Griggley's motion to reconsider, finding that there were no newly discovered facts to make the motion proper because Griggley and her counsel had the medical records at issue well before Fox filed her fee petition and the court made a ruling thereon.

¶ 21    Griggley subsequently filed a notice of appeal. She also filed an emergency motion to allow her to file Bryant's medical records under seal and for an order allowing the transmission of those records under seal to the appellate court as part of the record on appeal. In a written order, the circuit court denied the motion without explanation.

¶ 22                                     II. ANALYSIS

¶ 23    Griggley contends that the circuit court erred in awarding Fox the full amount of her requested fees as guardian *ad litem* where Fox's invoice logs lacked the requisite detail, her appointment as guardian *ad litem* did not require any novel work but rather was akin to document review, and her fees were exorbitant in light of her lack of her assets. Griggley accordingly argues that Fox's fees should be substantially reduced.

¶ 24                    A. Relationship Between a Guardian and Power of Attorney

¶ 25    At the outset, we must discuss the intersection of the Illinois Power of Attorney Act (POA Act) (755 ILCS 45/1-1 *et seq.* (Wes 2022)) and Article 11a of the Probate Act of 1975 (Probate

Act) (755 ILCS 5/11a-1 to 11a-25 (West 2022)), which deals with guardians for adults with disabilities, as this case involves the confluence of those two acts.

¶ 26    The purpose of the POA Act is to "recognize[] that each individual has the right to appoint an agent to make property, financial, personal, and health care decisions for the individual." 755 ILCS 45/2-1. However, "this right cannot be fully effective unless the principal may empower the agent to act throughout the principal's lifetime, including during periods of disability, and have confidence that third parties will honor the agent's authority at all times." *Id.* To ensure this right is honored, "[u]nless the agency states an earlier termination date, the agency continues until the death of the principal, notwithstanding any lapse of time, the principal's disability or incapacity or appointment of a guardian for the principal after the agency is signed." *Id.* § 2-5. In furtherance of this durability, "[a]ll acts of the agent within the scope of the agency during any period of disability, incapacity or incompetency of the principal have the same effect and inure to the benefit of and bind the principal and his successors in interest as if the principal were competent and not a person with a disability." *Id.* § 2-6(a). Given the strong statutory protection for an individual's right to choose his agent, courts are reluctant to interfere with an agency granted by a power of attorney. *In re Estate of Beetler*, 2017 IL App (3d) 160248, ¶ 32. "The statutory scheme makes it clear that this agency is strictly protected from judicial intervention except under a very narrow set of rigid procedural circumstances." *Id.* Those narrow circumstances allowing judicial intervention are listed in section 2-10 of the POA Act (755 ILCS 45/2-10 (West 2022)). They require an interested party to file a petition and generally involve situations when the principal lacks capacity to revoke an agency and where the agent is not acting on behalf of the principal in accordance with the power of attorney. *Id.*

¶ 27    Whereas a power of attorney allows an individual to choose the decisionmaker for himself outside of court supervision (see *id.* § 2-1 *et seq.*), a guardianship is a court-supervised proceeding. 755 ILCS 5/11a-1 to 11a-25 (West 2022). Consistent with the POA Act's purpose and statutory directives, the Probate Act "recognizes the agency created by a valid power of attorney may survive a disability and the appointment of a plenary guardian." *In re Estate of Beetler*, 2017 IL App (3d) 160248, ¶ 33. "Absent court order pursuant to the [POA Act] directing a guardian to exercise powers of the principal under an agency that survives disability, the guardian has no power, duty, or liability with respect to any personal or health care matters covered by the agency." 755 ILCS 5/11a-17(c) (West 2022). In other words, except for a narrow set of circumstances, the agency created by a power of attorney trumps any appointment of a guardian. *In re Estate of Beetler*, 2017 IL App (3d) 160248, ¶¶ 38-39, 42.

¶ 28                              B. Guardian *Ad Litem* Fees and the Probate Act

¶ 29    Having discussed the intersection of the Probate Act and the POA Act, we now turn to the guardianship proceedings instituted in this case by Griggley. When an individual files a petition to be appointed guardian of a person, his estate or both, the circuit court must set the matter for a hearing within 30 days. 755 ILCS 5/11a-10(a) (West 2022). The court also must appoint a guardian *ad litem* "to report to the court concerning the respondent's best interests consistent with the provisions of this Section, except that the appointment of a guardian ad litem shall not be required when the court determines that such appointment is not necessary for the protection of the respondent or a reasonably informed decision on the petition." *Id.* Once appointed, the guardian *ad litem* has certain responsibilities, including personally observing the respondent prior to the hearing and informing the respondent of his rights. *Id.* Following the guardian *ad litem*'s investigation, she must file a written report detailing it and "any other material issue discovered"

by her. *Id.* Through the written report, the guardian *ad litem*'s role is to represent the best interests of the respondent to the court. *In re Guardianship of Mabry*, 281 Ill. App. 3d 76, 88 (1996). Additionally, once a petition is filed, it cannot be withdrawn or dismissed without leave of the court. 755 ILCS 5/11a-8 (West 2022).

¶ 30    Based on the guardian *ad litem*'s work in a case, the circuit "court may allow the guardian ad litem reasonable compensation." *Id.* § 11a-10(a). The allocation of such:

> "fees and costs is within the discretion of the court. No legal fees, appointed counsel fees, guardian ad litem fees, or costs shall be assessed against the Office of the State Guardian, the public guardian, an adult protective services agency, the Department of Children and Family Services, or the agency designated by the Governor under Section 1 of the Protection and Advocacy for Persons with Developmental Disabilities Act." *Id.* § 11a-10(c).

The guardian *ad litem*, as the fee petitioner, has the burden to present the circuit court with sufficient evidence to justify her fees. *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 983 (1987). "An appropriate fee consists of reasonable charges for reasonable services." *Id.* The guardian *ad litem* "must specify the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor." *Id.* at 984. In considering the reasonableness of the requested fees, the court should consider various factors, including the nature of the case, the prudence used by the guardian *ad litem*, the time expended by the guardian *ad litem*, the size of the estate, the nature of the work involved, including the novelty and complexity thereof, and the benefits conferred by the guardian *ad litem*. *In re Estate of Halas*, 159 Ill. App. 3d 818, 832 (1987). Given that section 11a-10(a) of the Probate Act (755 ILCS 5/11a-10(a) (West 2022)) provides that "[t]he court may allow the guardian ad litem reasonable compensation," the

court has discretion in determining whether a guardian *ad litem* is entitled to compensation and what amount of compensation is reasonable. *In re Estate of Wellman*, 174 Ill. 2d 335, 353 (1996). The court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable such that no reasonable person would make the same decision. *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 31                                    C. The Instant Fee Award

¶ 32    Having discussed the intersection of guardianship proceedings under the Probate Act and a power of attorney under the POA Act as well as a guardian *ad litem*'s role in guardianship proceedings and the compensation to which she may be entitled, we now turn to the circuit court's award of $5,610 in fees to Fox for her work as guardian *ad litem*. Before initiating the instant probate matter, Griggley was in the process of helping Bryant prosecute a medical malpractice case in the law division of the circuit court. In an attempt to assist Bryant in discovery there, Griggley, based on instructions from Judge Durkin, opened the probate matter by filing a petition to be appointed guardian of Bryant's person and estate. Griggley's stated goal of filing such a petition was to obtain an order from the probate court, which she could take to the medical malpractice case and use to get a protective order to assist Bryant with discovery.

¶ 33    Upon Griggley filing the petition, the probate court followed its statutory mandate by appointing Fox as guardian *ad litem* to represent the best interests of Bryant, as the respondent. See 755 ILCS 5/11a-10(a) (West 2022). And while the court is not required to appoint a guardian *ad litem* in every case (see *id.*), Griggley has made no argument that the appointment was unnecessary. Upon being appointed as guardian *ad litem* and learning of the unusual procedural posture of the case, Fox represented to the court that there were essentially two paths for Griggley to take in assisting Bryant with the prosecution of his medical malpractice case.

¶ 34    The first path was for Griggley to use Bryant's power of attorney for property, which had named her as his agent and expressly authorized her to act on his behalf with respect to any claims or litigation. See 755 ILCS 45/3-4(j) (West 2022) (explaining that authorizing an agent through a power of attorney for property to act with respect to any claims or litigation results in the agent being "authorized to: institute, prosecute, defend, abandon, compromise, arbitrate, settle and dispose of any claim in favor of or against the principal or any property interests of the principal; collect and receipt for any claim or settlement proceeds and waive or release all rights of the principal; employ attorneys and others and enter into contingency agreements and other contracts as necessary in connection with litigation; and, in general, exercise all powers with respect to claims and litigation which the principal could if present and under no disability"). However, Griggley could only use the power of attorney if Bryant—who had suffered a debilitating stroke only a year earlier—was competent to execute it, a prerequisite to a power of attorney being valid. See *In re Estate of Stark*, 374 Ill. App. 3d 516, 521 (2007). Choosing this path, as Fox discussed in proceedings below, would obviate the need for a guardianship because a validly executed power of attorney trumps a guardianship. See *In re Estate of Beetler*, 2017 IL App (3d) 160248, ¶¶ 38-39, 42. But, if Bryant was not competent when he executed his power of attorney for property—a legitimate question given the facts of its execution juxtaposed with the timing of his stroke—then, the alternative path for Griggley was petitioning the circuit court for a guardianship. See 755 ILCS 5/11a-18(c) (West 2022) (providing that "[t]he guardian of the estate of a ward shall appear for and represent the ward in all legal proceedings unless another person is appointed for that purpose as guardian or next friend").

¶ 35    Given the unique circumstances of this case, Fox rightly concluded that her primary duty as guardian *ad litem* in order to protect the best interests of Bryant was determining the validity of

his power of attorney for property. See 755 ILCS 5/11a-10(a) (West 2022) (providing that a guardian *ad litem* has a responsibility to provide a written report to the court detailing her investigation and "any other material issue discovered by the guardian *ad litem*"). And the critical inquiry in determining its validity was Bryant's competency at the time of execution. See *In re Estate of Stark*, 374 Ill. App. 3d at 521. To answer this question, Fox sought medical records contemporaneous to the time that Bryant executed the powers of attorney to determine whether he had the competency to execute them, a reasonable request in protecting Bryant's best interests given that he suffered a stroke only a year before execution. In accordance with Fox's request, the circuit court ordered Griggley's attorney to tender Fox medical records of Bryant's from around July 2020, including those from a May 2020 hospitalization.

¶ 36    But instead of providing exactly as the circuit court ordered, and as Fox had requested, Griggley's attorney tendered to Fox medical records that included ones spanning from 2011 to 2019. In exercising due diligence, Fox did not merely disregard those older medical records, but rather reviewed them, a reasonable decision under the circumstances. Based on Fox's review of those older medical records as well as the ones contemporaneous with Bryant's July 2020 execution of his powers of attorney, Fox concluded that Bryant had the competency to execute the powers of attorney and reported this conclusion to the court. In turn, the court issued an order finding that Bryant's powers of attorney were valid. Merely a week later in the medical malpractice case in the law division, using the probate court's order, which was based almost exclusively on Fox's work, Bryant filed his motion to substitute Griggley, his duly appointed power of attorney, as the party plaintiff and for leave to file a third amended complaint reflecting that substitution. Judge Durkin allowed those motions, and as a result, Fox's work as guardian *ad litem* for Bryant resulted in significant benefits for him and Griggley in the medical malpractice action.

¶ 37    Thereafter, Fox, as she was statutorily allowed to do (see 755 ILCS 5/11a-10(a) (West 2022)), sought to be compensated for her work protecting Bryant's best interests and advancing his underlying medical malpractice case. In particular, of the 18.7 hours Fox claimed to have expended on the case, she asserted that 8.3 hours were for reviewing Bryant's medical records. Although the specific medical records are not included in the record on appeal for our review because the circuit court denied Griggley's emergency motion to have those records included, we have reviewed Fox's invoice logs juxtaposed with all of the circumstances of this case, just as the court did. In reaching its decision, the court had to balance equities on both sides. On Fox's side, she expended significant work on the case, which ultimately benefitted Bryant and Griggley, and allowed them to advance the medical malpractice case. On Griggley's side, as the record reveals, she has very limited assets. Balancing these equities, the court came to a reasoned decision finding that Fox was entitled to her entire fee request. Having reviewed the record just as the court, we cannot say its decision to award Fox $5,610 for 18.7 hours of work, including 8.3 hours reviewing medical records, was fanciful, arbitrary, or unreasonable such that no reasonable person would make the same decision. See *Seymour*, 2015 IL 118432, ¶ 41.

¶ 38    Nevertheless, Griggley argues that the circuit court abused its discretion in awarding Fox all of her requested fees because her invoice logs were not sufficiently detailed with respect to her review of Bryant's medical records. For 6.4 of the 8.3 hours Fox expended to review Byrant's medical records, she simply stated in her invoice logs that she "[c]ontinued reviewing medical records" or "[r]eviewed medical records from 2011-2020." Certainly, Fox could have included more detail about her review of these medical records. But the level of detail provided in invoice logs is just one factor for the court to consider when determining the reasonableness of a fee award. See *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶¶ 135-136. In fact, "the failure of the

attorney to keep contemporaneous time records does not negate the reasonableness of the fee award." *Id.* ¶ 136. This is because the court may "use its own knowledge and experience to assess the time required to complete particular activities involved in a case." *Id.* While Fox could have provided more detail in her invoice logs regarding her review of Bryant's medical records, there is nothing suspicious about the lack of detail, especially juxtaposed against her meticulously detailed invoice logs for other work she performed. The fact that Fox did not provide additional detail in her invoice logs for her review of Bryant's medical records does not give us pause about the reasonableness of the court's fee award.

¶ 39    Griggley next argues that the circuit court's fee award was unreasonable because determining the validity of Bryant's powers of attorney did not involve any novel or difficult work. Griggley posits that, instead of reviewing the voluminous medical records, Fox could have reached the conclusion that Bryant was competent to execute the powers of attorney by reviewing other evidence of record. According to Griggley, Fox could have concluded Bryant was competent by reviewing the affidavit of Hart, the attorney whom Griggley retained to prepare the powers of attorney, and the report of physician from Dr. Soong, which supported the initial guardianship petition from Griggley. Therein, Dr. Soong noted that Bryant was "capable of making and expressing personal and financial decisions relative to his person in generality." While certainly Dr. Soong's report of physician and Hart's affidavit are evidence to support the conclusion that Bryant was competent to execute the powers of attorney, we cannot fault Fox for being diligent and also reviewing medical records. Whether Fox's review of these medical records was superfluous was a question for the circuit court to resolve and consider in its weighing of various factors. The court did just this, and nothing about its finding in Fox's favor is unreasonable.

¶ 40 Griggley further argues that Fox's review of the medical records was akin to document review. According to Griggley, the lack of skill needed to review the medical records demonstrates that the court should have reduced Fox's fees. We are not persuaded by Griggley's argument, as it is disingenuous for her to argue that Fox expended too much time, and rendered corresponding fees therefrom, reviewing these medical records. As previously discussed, in proceedings below, Fox requested, and the circuit court ordered, that Griggley's counsel tender to Fox medical records contemporaneous to the time Bryant executed his powers of attorney. Thereafter, Fox informed Griggley's counsel that all she needed to tender was a limited amount of documentation from Bryant's hospitalization ending in May 2020. But instead of assenting to Fox's request to narrow the scope of documentation, Griggley's counsel responded that she did not have time to sift through the medical records to fulfill Fox's request. In turn, Griggley's counsel apparently tendered Fox all of Bryant's medical records from Bryant's hospitalization ending in May 2020 plus unrequested records from 2011 through 2019. Griggley's counsel's refusal to limit the amount of documentation tendered to Fox resulted in the allegedly exorbitant fees. There is no basis to reduce her fees based on a substantial part of her work involving the review of Bryant's medical records.

¶ 41 Next, Griggley asserts that the circuit court abused its discretion in not reducing Fox's fees because no estate was actually administered in the probate matter. According to Griggley, given that no estate was administered and her lack of assets generally, the court encouraged Fox to pursue the least efficient means possible to determine Bryant's competency to execute the powers of attorney by having her review his medical records rather than relying on Hart's affidavit or talking to the witnesses present when Bryant executed the powers of attorney.

¶ 42 We note that there is some disagreement in the appellate court about whether a guardian *ad litem* can be awarded fees where an estate is never opened. For instance, *In re Prior*, 116 Ill.

App. 3d 666, 668-69 (1983), the appellate court concluded, with one justice dissenting, that a guardian *ad litem* cannot be awarded such fees prior to the administration of a respondent's estate. Several years later, in *In re Serafin*, 272 Ill. App. 3d 239, 244 (1995), the appellate court disagreed with *In re Prior* and concluded that its holding was a too narrow reading of the Probate Act. The *In re Serafin* court remarked that, "[i]n many instances, in performing his duties at the direction of a court, a [guardian *ad litem*] may provide extensive and valuable service in representing the interests of a respondent alleged to be disabled without there ever being an 'estate' in property to 'administer.' " *Id.* Consequently, the appellate court held that a guardian *ad litem* may be able to recover fees without an estate being opened. *Id.* at 245-46. Although Griggley's argument tangentially touches upon this issue, she has made no explicit argument that the circuit court could not statutorily award fees to Fox, as guardian *ad litem*, because no estate had been opened. Rather, Griggley uses this fact merely as a factor to which the court allegedly failed to give proper weight when awarding Fox all of her requested fees. As such, any claim that Fox could not be awarded fees as guardian *ad litem*, as a matter of statutory construction, because an estate was never actually opened is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1. 2020) (providing that "[p]oints not argued are forfeited").

¶ 43    As to the circuit court awarding Fox all of her fees despite there being no assets in the estate and Griggley's financial status generally, certainly these are factors to be considered. See *In re Estate of Halas*, 159 Ill. App. 3d at 832. And indeed, the court explicitly considered the issue of no estate being opened and was plainly aware of Griggley's financial status, as that fact was brought up before the court. But the court also considered several other factors. It did so after holding a hearing on Fox's fee petition, reviewing the parties' written filings on the petition and listening to the parties' oral argument. And after all of this, the court arrived at a decision that

exhibited careful consideration of all relevant factors. As we have previously discussed, this case required a balancing act of Griggley's financial situation and Fox's work, which resulted in a significant benefit to Griggley and Bryant in the underlying medical malpractice case. Given this benefit to Griggley, the court reasonably concluded that no reduction in fees was warranted—despite her financial situation—because Fox's review of the medical records was critical to making the finding that Bryant was competent to execute the powers of attorney.

¶ 44    Lastly, Griggley argues that Fox personally attacked her counsel and the circuit court failed to rebuke those attacks. This failure, according to Griggley, shows that there was no argument or legal authority that would have led the court to reducing Fox's fees. Having reviewed the entirety of the record, we find no bias from the court that makes us question the reasonableness of its award of fees to Fox. And in sum, because the court's award of fees to Fox, as guardian *ad litem*, was reasonable given the circumstances, the court did not abuse its discretion making Griggley personally liable for the $5,610 in guardian *ad litem* fees.

¶ 45    As a concluding note, in its order finding Fox entitled to all of her requested fees as guardian *ad litem*, the circuit court found no legal basis to make Griggley's counsel liable for those fees. Under the prior version of section 11a-10(c) of the Probate Act, this was entirely correct. Prior to January 1, 2022, section 11a-10(c) provided that, "[i]f the respondent is unable to pay the fee of the guardian ad litem or appointed counsel, or both, the court may enter an order for the petitioner to pay all such fees or such amounts as the respondent or the respondent's estate may be unable to pay." 755 ILCS 5/11a-10(c) (West 2020). The only exception to making the petitioner liable was if the petitioner was a specifically enumerated entity exempt from assessment, such as the Office of the State Guardian. *Id.* Under this statutory mandate, the court had to engage in a two-step analysis to determine who would bear the fees of the guardian *ad litem*. *In re Estate of*

*Watts*, 2022 IL App (1st) 210521, ¶¶ 25-26. If the respondent or respondent's estate could not pay, then the only other party allowed to be assessed the fees of the guardian *ad litem* was the petitioner unless the petitioner was a specifically enumerated entity exempt from assessment. See 755 ILCS 5/11a-10(c) (West 2020); *In re Estate of Watts*, 2022 IL App (1st) 210521, ¶¶ 25-26.

¶ 46    However, effective January 1, 2022, our legislature amended section 11a-10(c) of the Probate Act. See Pub. Act 102-191, § 5 (eff. Jan. 1, 2022) (amending 755 ILCS 5/11a-10(c)). The current version of section 11a-10(c), as amended by Public Act 102-191 and as previously discussed, provides that "[t]he allocation of guardian ad litem fees and costs is within the discretion of the court." 755 ILCS 5/11a-10(c) (West 2022). However, similar to the earlier version of the statute, "[n]o legal fees, appointed counsel fees, guardian ad litem fees, or costs shall be assessed against" specifically enumerated entities, including again the Office of the State Guardian, among others. *Id.* Based on Public Act 102-191, the court now has much more discretion in allocating guardian *ad litem* fees, including potentially making the attorney of a petitioner liable for such fees contrary to the court's conclusion in this case. While we cannot reverse the court's judgment for unargued and unbriefed reasons unless a jurisdictional issue is present (see *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978)), we highlight this amendment and the resulting flexibility of the court in allocating guardian *ad litem* fees should a situation similar to this case arise in the future.

¶ 47                                  D. Sanctions

¶ 48    Having concluded that the circuit court did not abuse its discretion in making Griggley liable for all of Fox's requested guardian *ad litem* fees, we turn to Fox's contention that we should sanction Griggley's attorneys for filing a frivolous appeal.

¶ 49    Under Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994), if the appellate court determines that an appeal was frivolous or not taken in good faith, "an appropriate sanction may be imposed upon any party or the attorney or attorneys of the party or parties." According to Rule 375(b), "[a]n appeal or other action will be deemed frivolous where it is not reasonably well grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." *Id.* Further, "[a]n appeal or other action will be deemed to have been taken or prosecuted for an improper purpose where the primary purpose of the appeal or other action is to delay, harass, or cause needless expense." *Id.* If the appellate court concludes that an appeal was frivolous or not taken in good faith, appropriate sanctions "may include an order to pay to the other party or parties damages, the reasonable costs of the appeal or other action, and any other expenses necessarily incurred by the filing of the appeal or other action, including reasonable attorney fees." *Id.*

¶ 50    Having reviewed the record and the briefing in this case, we do not believe sanctions are warranted. While ultimately not succeeding on appeal, Griggley's counsel advanced good-faith legal arguments that the circuit court abused its discretion in awarding Fox all of her requested fees. This was not a frivolous appeal, and we likewise see no evidence that it was initiated only to harass Fox. Consequently, we deny Fox's request for sanctions.

¶ 51                                    III. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.